IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

PETER KOFLER                                                    PETITIONER

            v.              Civil No. 07-5040

LANA BETH KOFLER                                               RESPONDENT


### MEMORANDUM OPINION AND ORDER

Currently before the Court is Petitioner Peter Kofler's **Petition (Doc. 1)** seeking the return of his three minor children to Germany under the Hague Convention on the Civil Aspects of International Child Abduction, and its implementing legislation, the International Child Abduction Remedies Act (ICARA), 42 U.S.C. § 11601 - 11610.[1]  The Court conducted an evidentiary hearing on March 21, 2007, and a supplemental evidentiary hearing on May 31, 2007.  The Court granted the parties a period of time to submit documentation to the Court regarding the status of related legal

---

1.    On March 8, 2007, the Court granted petitioner's **Petition for Emergency Ex Parte Relief (Doc. 3)** and **Petition for Emergency Warrant in Lieu of Writ of Habeas Corpus (Doc. 4)** to the extent that the Court ordered the minor children taken into protective custody and brought before the Court, along with the respondent, for a hearing.

After the hearing, the Court denied petitioner's request to place the children in the custody of petitioner's parents pending a hearing on the merits of this matter. The Court found it to be in the best interest of the children to remain in the custody of the respondent pending the hearing, but the Court prohibited the respondent from removing the children from this district. (Docs. 5, 6.)

proceedings pending in Germany.  The matter is now ripe for decision and the Court, being well and sufficiently advised, finds and orders as follows:

## I.   BACKGROUND

‎      1.   In his petition seeking the return of his children, petitioner alleges the following:

      *    that he and his wife, Lana Beth Kofler (hereinafter "respondent"), have three children, whom the Court will refer to as A.K. (age 15), P.K. (age 13), and J.K. (age 11);

      *    that the children have dual citizenship in the United States and Switzerland;

      *    that petitioner and respondent moved to Germany in 1995, and the family thereafter continuously resided in Germany;

      *    that petitioner and respondent separated in 2002 and divorce proceedings are currently pending in Germany;

      *    that under German civil law, both parties share joint custody of the children;

      *    that, on or about April 19, 2006, petitioner gave respondent permission to take the children to the northern part of Germany for a couple of days, but respondent failed to return the children and secreted their whereabouts; and

      *    that respondent is now residing with the children in the Rogers, Arkansas area.  (Doc. 1 ¶ ¶ 2-6.)

-2-

2.   In her **Response (Doc. 9),** the respondent states:

*   that German law did not forbid her from removing the children from Germany;

*   that petitioner was not exercising his joint custody rights;

*   that she did not request permission to take the children, as she did not need to do so;

*   that she has not secreted the children's whereabouts;

*   that petitioner's failure to request the return of the children prior to instituting this action constitutes "implied consent and acquiescence to their move to the United States" (Doc. 9 ¶ 19);

*   that the German divorce proceedings have been pending for over four years and "due to the Petitioner's conduct and the inaction of the German courts and the fact that the children are presently thriving in the United States[,] this Court should determine that they should not be returned to Germany" (Doc. 9 ¶ 13); and

*   that the children prefer living here than in Germany and, due to the children's age and maturity, the Court should consider their opinion.

## II.  DISCUSSION

3.   The Hague Convention attempts to "'protect children internationally from the harmful effects of their wrongful removal

-3-

or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access.'" <u>Rydder v. Rydder</u>, 49 F.3d 369, 372 (8th Cir. 1995), <u>quoting</u> the Hague Convention, Preamble.  The primary purpose of the Convention is to restore the *status quo ante* and to deter parents from crossing international boundaries in search of a more sympathetic court.  <u>Id.</u>

4.   The Convention and ICARA do not allow this Court to adjudicate the merits of the underlying custody claims.  <u>Id.</u> Rather, in an action for the return of a child, a petitioner must prove only that the child was removed "wrongfully."  <u>Id.</u>; 42 U.S.C. § 11603(e)(1)(A).

5.   A respondent who opposes the return of a child may advance any of the affirmative defenses to return listed in Articles 12, 13, or 20 of the Hague Convention.  42 U.S.C. § 11603(e)(2).  These exceptions, however, are to be construed narrowly.

## A.  Wrongful Removal

6.   Petitioner bears the initial burden of proving by a preponderance of the evidence that the children were "wrongfully removed or retained within the meaning of the Convention."  42 U.S.C. § 11603(e)(1)(A).  Under Article 3 of the Hague Convention, the removal or retention of a child is "wrongful" if:

(a)  it breaches the "rights of custody attributed to a person ... either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention"; and

(b)  such custody rights were actually being exercised.

The rights of custody mentioned in sub-paragraph (a) may arise "by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of that State."  Hague Convention, Art. 3.

7.   Thus, to establish a prima facie case of wrongful removal, petitioner must establish:

(a)  that the children were "habitual residents" of Germany;

(b)  that their removal was in breach of his custody rights under the law of Germany; and

(c)  that he had been exercising those rights at the time of the children's removal.  See Bader v. Kramer, 445 F.3d 346, 349 (4th Cir. 2006).

8.   Respondent does not appear to dispute that the children were habitual residents of Germany, but she does dispute that their removal violated petitioner's custody rights under German law.  At the initial evidentiary hearing, respondent testified that there was no "official" joint custody decree and that it was her understanding that the children were to live with her, with the petitioner having rights to visitation.

Under German law, both parents retain joint custody rights until a decree has been entered limiting one parent's rights.  See Bader, 445 F.3d at 350; Friedrich v. Friedrich, 78 F.3d 1060, 1064 (6th Cir. 1996); Currier v. Currier, 845 F. Supp. 916, 920-21 (D. N.H. 1994).  Respondent acknowledged at the hearing that she never petitioned the German Court for sole custody of the children. Petitioner, therefore, had joint custody rights.

9.   The next issue is whether the petitioner was exercising his custody rights.  According to the respondent, the petitioner did not want all three children to visit at one time and he prepared a chart setting out which of the three children could visit on which dates.  The petitioner explained that he did this because he was living in a small apartment with his girlfriend and her two daughters, he traveled a lot with his work, and he thought that he would be able to take better care of the children if they visited separately.  The respondent testified that the petitioner did not stick to the schedule he had proposed and that the children rarely had overnight visits with him.  According to the respondent, in 2005, the petitioner had overnight visits with A.K. on five occasions, and with P.K. and J.K. on nine occasions.  The respondent testified that in 2006, prior to her removing the children from Germany in April of that year, the petitioner saw the children for an hour or so on occasion but he did not have any overnight visits with them.

-6-

In Friedrich, 78 F.3d 1060, the Sixth Circuit Court of Appeals noted that the Hague Convention does not define what it means to "exercise" custody rights. The Court engaged in a lengthy analysis of the reasons for defining the term liberally and concluded:

> [I]f a person has valid custody rights to a child under the law of the country of the child's habitual residence, that person cannot fail to "exercise" those custody rights under the Hague Convention short of acts that constitute clear and unequivocal abandonment of the child. Once it determines that the parent exercised custody rights in any manner, the court should stop - completely avoiding the question whether the parent exercised the custody rights well or badly. These matters go to the merits of the custody dispute and are, therefore, beyond the subject matter jurisdiction of the federal courts.

Id. at 1065-66.

The Court, like other courts that have addressed the issue, finds this approach persuasive. See Bader, 484 F.3d at 671, citing Sealed Appellant v. Sealed Appellee, 394 F.3d 338, 344-45 (5th Cir. 2004); Baxter v. Baxter, 423 F.3d 363, 370 (3rd Cir. 2005). Applying these principles to the present case, the Court concludes that, while the petitioner may not have exercised his custody rights "well," he cannot be said to have clearly and unequivocally abandoned his children.

10. Based on the foregoing, the Court finds that the petitioner had joint custody rights to the children, that he was exercising those rights, and that the removal of the children from Germany breached his custody rights. The Court, therefore,

concludes that the respondent wrongfully removed the children from Germany.

## B. Exceptions to Return

11.   If petitioner is able to satisfy his initial burden of establishing wrongful retention, the children must be returned to Germany unless respondent can establish one of the exceptions available under the Hague Convention.

12.   The relevant exceptions under which the Court is not required to order the return of the children are:

(a)   the respondent consented to or subsequently acquiesced in the removal or retention;

(b)   the children object to being returned and the Court finds that the children have "attained an age and degree of maturity at which it is appropriate to take account of [their] views;" or

(c)   there is a grave risk that the return of the children would expose them to "physical or psychological harm or otherwise place [them] in an intolerable situation."   Hague Convention, Article 13.[2]

---

2.   A fourth exception is provided for in the Convention, but it does not apply in the instant case.  Specifically, under Article 12 of the Convention, if a petition for return is not filed within one year of the removal of the child and the child is "now settled in its new environment," return of the child is not mandated.  This exception is not applicable in this case, because the

The grave-risk exception must be proved by clear and convincing evidence.  The other two exceptions must be proved by a preponderance of the evidence.  <u>See</u> 42 U.S.C. § 11603(e)(2).

### Consent or Acquiescence to Removal

13.  Respondent contends that petitioner's failure to request the return of the children prior to instituting this action constitutes "implied consent and acquiescence to their move to the United States."  (Doc. 9 ¶ 19.)  The Court sees no merit to this argument.  At the initial hearing on this matter, the respondent acknowledged that she did not advise the petitioner that she was taking the children out of Germany; that she did not seek his permission to do so; and that she never communicated their whereabouts to him.  Further, as Exhibit A to the petition for return demonstrates, within a month after the removal of the children, petitioner filed an application seeking the return of the children with the German Central Authority under the Hague Convention.  The respondent has, therefore, failed to establish that the petitioner consented or acquiesced to the children's move to the United States.

### Children's Views

14.  Respondent next contends that the children "are presently thriving in the United States" (Doc. 9 ¶ 13); that they

_____

petition for return was filed within one year of the removal of the children from Germany.

prefer living here than in Germany; and that they are of such ages (15, 13, and 11) and maturity that the Court should consider their opinions.

15.   At the initial hearing conducted in this matter on March 21, 2007, the Court visited with all three children together in chambers.   This was done outside the presence of the petitioner and the respondent, but with counsel for both present.   The Court, not wanting to put the children in the position of being forced to identify which parent they wished to live with or where they wished to live, asked very few questions of the children and instead made an effort to give the children an opportunity to speak freely about any matters of which they wished the Court to be aware.   The Court gave counsel for the petitioner and the respondent an opportunity to question the children, but they declined to do so.   The children testified as follows at the initial hearing:

*    A.K., age 15, testified that his parents' divorce has continued on for the last five years and that visitation with his father "never worked out."   According to A.K., his father's apartment had three bedrooms and all three were used by his father and his girlfriend and the girlfriend's two daughters.   When the children did visit their father, P.K., J.K., and the girlfriend's younger daughter all slept on a pull-out couch and A.K. slept in the younger daughter's bedroom.   Further, all seven of them had to

share one bathroom.  A.K. testified that his father stated that his girlfriend did not like having all the children there.  A.K. further testified that he never saw his dad much and that he felt "left out."  A.K. described having a good relationship with his mother and stated that he wished to live with her and he believed his sisters did also.

* P.K., age 13, testified that she experienced "a lot of stress" from the situation with her father and, while he said the children could visit whenever they wanted, there was no room for them.  Further, when they called to ask to visit, "it never worked out."  P.K. stated that after leaving Germany, her mother told her and her siblings that if they wanted to return, she would make arrangements for them to do so.  P.K. further stated that her mother advised her to tell the Court if she did not want to remain in the United States, but that she did in fact wish to remain here and live with her mother.  P.K. also stated that she could have contacted her father after leaving Germany but that she did not wish to do so.

* J.K., age 11, was quite shy and did not express any views on the matters at issue.

16.  Following the March 21st evidentiary hearing, the Court took the case under advisement and granted the parties a period of time to submit translations from German to English of a letter and a German court order submitted as exhibits at the hearing.

-11-

Following the receipt of these documents, the Court conducted a conference call with counsel on April 18, 2007, to discuss whether either party had moved for custody in the German court proceedings and what financial and living arrangements the petitioner proposed to provide for the children should the Court order their return. The Court advised counsel to confer with their clients about these issues and then report back to the Court.

17.   The Court thereafter received letters from A.K., P.K., and J.K., dated April 22 and 23, 2007, stating that their mother had informed them about the telephone conference and that they wanted to make clear to the Court that they did not want to return to Germany.  (Court's Exs. 1 - 3.)

*   In his letter to the Court, A.K. wrote:

... I am American and I want to live in America with my mom and the rest of my American family.  I do not want to go back to Germany.  I do not want you to send me back.  I refuse to go back....  We wanted to come here and I want to stay here in America....

My relationship with my dad was always poor.  He usually listened to others around him more than me and my sisters.  I think he does not want us.... I refuse to live with him or anyone else in Germany!

Besides all those things[,] I don't want to be in the middle of him and his girlfriend or be sh[o]ved off in a children's/boys' home[] because of her and nowhere else to go.  I have read about that and kids which this has happen[e]d to ended up as mental wrecks or are suicidal.  I do not want to end up like that.

Here in America I have dreams I could never even imagine in Germany.  For example[,] ... I can play school sports...[,] I can be a junior counselor for

summer camp[,] and I can get my driver['] s license in 1 year and 2 months.

I am afraid ... [D]on't send me back, don't give my life to the German courts.  I already tried that.... Please[,] I'm begging you!

(Court's Ex. 3.)

*   In her letter to the Court, P.K. wrote:

I really don't want to go back to Germany ....  We came here to leave the stress with my father and build a new life here in America.  The fight always went on and on. I was so, so tired of my father hurting me.  My father hasn't [taken] care of us well and especi[al]ly when he is living with his girlfriend.  [He] tells us we can't visit him.  He won't leave his girlfriend for us.  It seems like ... he loves her more than he loves us.  I don't like it at all. He won't change.  We tried many years in Germany, giving him chance after chance.  Why would I want to live there anymore[?] It's great here and I want to stay here in America.  I have dreams here that I didn't have in Germany.  I can play my instrument (Viola) and I have more activities to do here.  Soon I'm going to play basketball or be in track, pom, or cheer....

I can't live without my mom, but I can live without my dad[,] especially because of what he has done to me and my siblings.  Please let us stay here with my mom.... I do not want to go back to Germany.  Be clear on this.

(Court's Ex. 2.)

*   In her letter to the Court, J.K. wrote:

Just to make it clear... I want to stay here with my mom.  I do not want to go back to Germany.  I love my school.  I love my teacher, I love my church, I love my new friends, I love being with my grandparents and American family, I love my house and my bedroom ... I want to stay!

(Court's Ex. 1.)

-13-

18.  On May 4, 2007, the respondent filed a Motion for Hearing (Doc. 13), stating that the children had "expressed a desire to further be heard in this matter and ... wish to express their views and desire to remain in the United States." (Doc. 13 ¶ ¶ 1, 3.)  The petitioner objected to the motion, asserting that the Court had the opportunity to discuss all relevant issues with the children at the previous hearing.  The petitioner further argued that it appeared from the letters forwarded by the children to the Court that the respondent was pressuring the children to make statements to the Court to buttress her legal position. (Doc. 16.)  The Court granted the motion for hearing over the petitioner's objection, finding it proper to permit the parties' children to testify, should they wish to do so, before the Court in camera.  (Doc. 15.)

19.  The Court conducted a supplemental evidentiary hearing on May 31, 2007.  At this hearing, the respondent testified that she would be "tickled to death" if the children could have a healthy relationship with their father and that she has never stood in the way of this.  The respondent noted that since the initial hearing in this case in March, the petitioner had made no attempt to contact the children.  The respondent denied influencing the children's decision about where they wanted to live and stated that the children wanted to leave Germany and come to the United States.

The respondent testified that after her attorney informed her about the conference call with the Court, she and the children had a "family meeting." According to the respondent, "we said what can we do – write the President, write the judge?" The respondent testified that she told the children that if they wanted to write a letter to the Court, that they should put it in their own words, stating whether they wanted to return to Germany and what their wishes and fears were.

20. During the supplemental evidentiary hearing, the Court visited with each child separately in chambers, outside the presence of their parents, but with counsel for both present. Again, the Court gave counsel an opportunity to question each child, but they declined to do so. The children testified as follows:

* A.K. testified that his mother informed him and his sisters about the telephone conference the Court had with counsel and that they then had a family meeting to discuss how to get across to the Court what the children wanted. According to A.K., he and his sisters decided to write letters to the Court to make sure the Court understood that they did not want to return to Germany.

A.K. testified that when they lived in Germany, he and his mother and sisters were barely getting by and lived in a house without heat for one winter. A.K. characterized his life in the

-15-

United States as great and his life in Germany as "crappy."  A.K. pointed out that he is making straight A's in school here, that he has gotten his driver's permit, and that he has started his own "mowing business."  A.K. testified that he loves living in the United States, that he has a much better life here, and that he does not want to "lose it all."

A.K. appeared worried about the prospect of being returned to Germany, stating that he found an article on the internet about kids in "similar situations" turning into "mental wrecks" and becoming suicidal.  A.K. stated that he did not want to end up "like that."  A.K. stated that he was also concerned about how returning to Germany would affect his youngest sister, J.K., because when they lived in Germany, J.K. could barely read and she is "doing so much better" in the United States.  A.K. noted that since his father located them in the United States, he has not called or written once and that he did not even send J.K. a card when she had her birthday recently.

*    P.K. testified that she and her brother and sister decided to write the letters to the Court and that her mother did not suggest the idea.  P.K. stated that they wanted to come to the United States for a better life and that her mother told them that they could return to Germany at any time if they wanted.  P.K. testified that she "really want[s]" to stay in the United States,

and she emphasized that this opinion was "coming" from her and not her mother.

    *    J.K., the youngest of the children, was quite shy, just as she was when the Court visited with her on the date of the initial hearing, but she did make certain statements when questioned by the Court.  Specifically, J.K. stated that the decision to write the Court was "mostly a group decision."  When asked whether the letter she wrote represented what she wanted to tell the Court, J.K. indicated that it was.

    21.  At both the initial and supplemental evidentiary hearings, the children presented the Court with their report cards, which reflected that they are doing very well in school.  They also presented the Court with photographs and other memorabilia reflecting that they are involved in school, church, and many other activities.

    22.  Even if a petitioner establishes that the removal of a child was wrongful, a court may refuse to return the child "*solely* on the basis of a considered objection to returning by a sufficiently mature child."  Blondin v. Dubois, 238 F.3d 153, 166 (2nd Cir. 2001); see also De Silva v. Pitts, 481 F.3d 1279, 1286 (10th Cir. 2007).  According to the Explanatory Report of the Convention, a child's objection may be conclusive:

> [T]he Convention also provides that the child's views concerning the essential question of its return or retention may be conclusive, provided it has ...

attained an age and degree of maturity sufficient for its views to be taken into account.

Elisa Perez-Vera, Explanatory Report: Hague Conference on Private International Law, in 3 Acts and Documents of the Fourteenth Session 426 (1980) ("the Explanatory Report"), ¶ 30.

23. As stated above, ICARA specifically states that the "objection" exception need only be established by a preponderance of the evidence:

> Congress has added to the Convention's endorsement of the exception the codicil that the factual predicate for finding that a mature objection has been made need only be established by the customary civil action standard of a preponderance of the evidence.  In contrast to the other exception argued in this case, the prospect of a "grave risk" of physical or psychological harm to the child if returned, establishing the "objection" exception to return is not subject to a stringent burden of proof, and thus a court may more readily find a valid objection than it could find the existence of a grave risk.  This difference in stringency of examination is expressly mandated by ICARA, 42 U.S.C. § 11603(e)(2). From this [the Court] concludes that the "objection" exception to a summary order of return is meant, both by the drafters and signers of the Convention and by Congress, to be used.

McManus v. McManus, 354 F. Supp.2d 62, 72 (D. Mass. 2005).

24.  The Hague Convention does not establish a minimum age at which a child is old enough and mature enough to trigger this provision.  As explained in the Explanatory Report, "all efforts to agree on a minimum age at which the views of the child could be taken into account failed, since all the ages suggested seemed artificial, even arbitrary."  Explanatory Report, ¶ 30.  The Explanatory Report itself, however, cites the example of a

-18-

fifteen-year old: "[T]he fact must be acknowledged that it would be very difficult to accept that a child of, for example, fifteen years of age, should be returned against its will." <u>Id.</u> It is also noteworthy that the Convention ceases to apply once a child attains the age of 16. <u>See</u> Hague Convention, Article 4.

25. The Court found A.K., age 15, and P.K., age 13, to be very bright and mature. They both vehemently stated their objections to being returned to Germany and it was clear that they had given the issue a great deal of thought. In their letters to the Court and in their testimony, A.K. and P.K. gave detailed reasons as to why they wished to remain in the United States with their mother and did not want to return to Germany. Specifically, A.K. and P.K stated that they had a close relationship with their mother and a poor relationship with their father; that they rarely saw their father when they lived in Germany; that their father's girlfriend did not like having the children there; that they felt like their father did not take care of them and did not want a relationship with them; that they loved living in the United States and their living conditions were much better here; that they were doing very well in school and were involved in many activities; that they had more opportunities in the United States than in Germany; and that they had fears and concerns about returning to Germany.

With regard to J.K., she was very shy when the Court visited with her in chambers, as any 11-year old likely would be. She did, however, write the Court a letter unequivocally stating that she did not want to return to Germany, that she wished to stay in the United States with her mother, and that she loved her new home, her school, her teacher, her church, her friends, and her American family. She affirmed to the Court that this letter expressed her feelings on the matter.

26. The Court is mindful of the fact that if the children's opinions are the product of undue influence by their mother, then their wishes should not be taken into account. See DeSilva, 481 F.3d at 1286. At the initial evidentiary hearing in this matter, the children expressed their desire to live with their mother rather than their father. P.K. stated that she wished to remain in the United States, but none of the children voiced any specific objections to returning to Germany. As pointed out above, the Court wanted the children to speak freely about the matters they wished the Court to consider. The Court, therefore, chose not to specifically question them about where they wished to live. However, it is logical to infer that when the children stated that they wanted to live with their mother, they assumed this would be in the United States, where their mother resides, works, and has citizenship, and that is why they did not voice their objections to returning to Germany at the initial hearing.

As detailed above, following the initial hearing, the Court conducted a conference call with counsel and advised counsel to confer with their clients regarding, inter alia, what arrangements the petitioner proposed to provide for the children should the Court order their return.   It appears that when respondent's counsel advised her of the conference call, she became very concerned that the Court would, in fact, return the children to Germany and called a "family meeting" with the children.   This resulted in the children writing letters to the Court stating their objections to returning and in the respondent filing a motion for a supplemental hearing, which the Court granted, to allow the children to "further be heard" on this issue.

The petitioner contends that the respondent pressured the children into making the statements about not wanting to return to Germany.   The Court has no doubt that the impetus to the children's decision to write letters to the Court was the "family meeting" in which their mother informed them about the conference call.   However, the Court believes that the detailed content of the letters and the children's testimony at the supplemental evidentiary hearing represents the honest opinions and wishes of the children and was not unduly influenced by their mother.   Cf. Blondin v. Dubois, 78 F. Supp.2d 283, 296 (S.D. N.Y. 2000), aff'd 238 F.3d 153 (2nd Cir. 2001), (district court found that while child might have been coached by mother to some degree, her

objection to being returned was not the product of mother's "undue influence").

27. Based on the foregoing, the Court finds that the children's views were not unduly influenced by their mother and that the two older children are of sufficient age and maturity for it to consider and respect their objections to being returned to Germany.  While it is a closer call on the maturity issue with respect to the youngest child (J.K.) than with A.K. and P.K., the Court believes that J.K., although shy in conversing with the Court, expressed her wishes to remain in the United States and that she is sufficiently mature to form and express an opinion on the issue.  Further, J.K. appears to have a very close relationship to her siblings, and it would not further the purposes of the Hague Convention to honor the wishes of A.K. and P.K. to remain in the United States, but to split the family and force J.K. to return to Germany.  Cf. McManus, 354 F. Supp.2d at 72 (relying in part on the close relationship of younger siblings to older siblings in deciding to allow younger children to remain in the United States).

28. The Court acknowledges that, in considering the children's objections to returning to Germany, it has considered the reasons for their objections – including, that they have a very close relationship with their mother, that they have a poor relationship with their father and feel unwanted by him, and that

they have better living conditions and opportunities in the United States.   As the <u>McManus</u> Court reasoned, these are proper considerations in analyzing a child's objections:

> It may be objected that this is simply a "best interests of the child" analysis masquerading as a "mature child's objection" analysis.  The answer to that objection is that while the former is forbidden in proceedings under the Convention, the latter is invited.  The Convention clearly contemplates that the objections of a mature child should be taken account of and can be relied on to override the return that would otherwise be mandated. Obviously, there may be some overlap between the two inquiries.  One can easily appreciate that giving effect to the mature objections may in any given case also be thought to be in the child's best interest...

<u>Id.</u> at 72.

Accordingly, the Court finds that denial of the petition for return is warranted based on the children's objections to returning to Germany.   <u>Cf.</u> <u>De Silva</u>, 481 F.3d at 1287-88 (affirming denial of petition to return 13-year-old child to Canada – child expressed desire to remain in Oklahoma pending resolution of custody dispute; magistrate judge interviewed child and determined that he was mature; and child indicated that he had friends in Oklahoma, that he was on the football and wrestling teams in Oklahoma, and that he wanted to remain in Oklahoma because he thought the school was better; and there was no showing that child was improperly swayed by his father).

**Grave Risk**

29.  The respondent contends that denial of the petition for return is also warranted under the grave-risk exception. Respondent asserts that returning the children to Germany would expose them to a grave risk of psychological harm or otherwise place them in an intolerable situation, because the children have a poor relationship with their father; their father's live-in girlfriend does not want the children there; their father did not provide adequate financial support for the children in Germany, resulting in the children being forced to live in very poor conditions; and due to these conditions, the youngest child needed psychological treatment.

30.  The respondent testified that she made a "life choice" to leave Germany with the children because they were not "surviving."   According to the respondent, the petitioner continually contested and appealed the orders of child support[3] and she had been in a legal battle with him for over three and a half years.   The respondent testified that she was only able to find part-time employment in a factory in Germany because she was not fluent in the language and the unemployment rate was high.

---

3.   Plaintiff's Exhibit 2 is an order entered by the German Court on September 21, 2006, resolving support issues dating back to August 2004.  The order set petitioner's current child support payments at 493 Euros a month, which equates to approximately $656.00 in American currency.

-24-

The respondent acknowledged that while she did receive some child support from the petitioner, it was not enough to provide for the children and they went without heat one winter because they were unable to pay the bill.  The respondent testified that they were also short of food at times and had to seek assistance from their neighbors and church.  The respondent noted that the child welfare department in Germany even became involved in the situation, but with "no success."

31.  With regard to the children's living conditions in the United States, the respondent testified that they live in a very nice townhouse and that each child has his or her own bedroom. The respondent explained that, prior to leaving Germany, she had secured a job in the United States earning over $30,000.00 a year. The respondent testified that the children are doing exceedingly well in school, that they are involved in many activities, and that things are "better than [she] could have dreamed" for them.

The respondent noted that when they lived in Germany, J.K. was traumatized from the divorce and their living conditions, she suffered panic attacks, and she barely talked.  According to the respondent, J.K. is a very happy child now.  J.K.'s teacher corroborated this, testifying that J.K. functioned at a very low level in every subject when she first started school but that she is now doing very well in school.  J.K.'s teacher stated that J.K.

has "blossomed" since starting school, that she never sees her without a smile, and that she is very outgoing now.

32.  In <u>Silverman v. Silverman</u>, 338 F.3d 886, 900 (8th Cir. 2003), <u>cert. denied</u>, 540 U.S. 1107 (2004), the Eighth Circuit construed the grave-risk exception very narrowly, holding that "there are two types of grave risk that are appropriate under Article 13(b): sending a child to a 'zone of war, famine, or disease,' or in cases of serious abuse or neglect." (citation omitted).  The Eighth Circuit specifically held the fact that the children are "settled in their new environment" should not be taken into account.  <u>Id.</u> at 901.  However, the Eighth Circuit has also held that it is proper to consider the environment in which the child will reside upon returning to the home country:

> [I]n order to determine whether a realistic basis exists for apprehension concerning the child's physical safety or mental well-being, [the Court] must be empowered to evaluate the surroundings to which the child is to be sent and the basic personal qualities of those located there.

<u>Nunez-Escudero v. Tice-Menley</u>, 58 F.3d 374, 377-78 (8th Cir. 1995), quoting <u>Tahan v. Duquette</u>, 613 A.2d 486, 489 (N.J. Ct. App. 1992).

33.  From the testimony in this case, it appears that the children did not see their father very often when they lived in Germany; that they have a poor relationship with him; and that they do not feel wanted by him.  According to A.K., his father stated that his live-in girlfriend did not want all three children at their apartment.

-26-

The evidence also raises questions concerning the petitioner's motives in this action and as to whether he actually wants all three children returned to Germany to live with him. The evidence indicates that when the children lived in Germany, the petitioner did not allow the three children to *visit* at one time -- because, he said, he lived in a small apartment; he traveled a lot with his work; and he thought that he would be able to take better care of the children if they visited separately. The Court also notes that, after the children's whereabouts were determined, it was the petitioner's parents -- not the petitioner -- who traveled to the United States to initiate this action and seek temporary custody of the children pending the hearing on the merits.   Further, at the initial evidentiary hearing in this matter, the petitioner testified that if the children were returned to Germany, he wanted them to be placed in both his custody *and* the custody of his parents, who, it should be noted, do not even live in Germany, but, rather, in Switzerland.   It also noteworthy that since locating the children in the United States, the petitioner has apparently not called or written them.

Finally, the testimony in this case indicates that the petitioner does not have a bedroom available for the children, as all three bedrooms of the petitioner's apartment are occupied by him, his girlfriend, and her two daughters.  Petitioner presented no evidence that he has made any effort to secure a residence that

would be sufficient to meet the children's basic needs should they be ordered to return to Germany.

34.  The children's objections to being returned are also appropriate to consider in analyzing the grave-risk issue.  See Blondin, 238 F.3d at 166-67.  As detailed above, A.K. and P.K. vehemently stated their objections to returning to Germany and gave very specific reasons for their objections.  A.K. stated that he had concerns about being in the "middle of [his father] and his girlfriend," "be[ing] sh[o]ved off in a children's/boys' home[]," and ending up a "mental wreck[]" or suicidal.  P.K. stated that her father had not "[taken] care of [them] well," that they moved to the United States "to leave the stress with [her] father" and that she was "tired of [her] father hurting" her.  The youngest of the children, J.K., suffered panic attacks and barely talked when she lived in Germany.

35.  Based on the foregoing, the Court concludes that ordering the children to be returned to Germany would be tantamount to requiring them to live with petitioner under conditions which would subject them to a grave risk of psychological harm or otherwise place them in an intolerable situation.[4]

_____

4.  The Court notes that the petitioner indicated he was agreeable to allowing the children to return to Germany with the respondent for the purpose of attending a hearing scheduled in Germany on August 3, 2007.  However, the Court has received numerous letters from counsel for

### III.   CONCLUSION

36.   Though the respondent's removal of the children from Germany was wrongful under the Hague Convention, the Court will decline to order their return to Germany as it has concluded that the mature-objection and grave-risk exceptions have been established under the Convention.

Accordingly, the **Petition (Doc. 1)** for return is **DENIED.** This order resolves all issues properly before the Court[5] and this case is, therefore, **DISMISSED.**

IT IS SO ORDERED this 18th day of July 2007.


/S/JIMM LARRY HENDREN
JIMM LARRY HENDREN
UNITED STATES DISTRICT JUDGE

---

both the petitioner and the respondent, in which they dispute whether the custody issue will be addressed at the hearing.  In the most recent letter, respondent's counsel states that the hearing has been cancelled due to a medical condition of the judge.  Also, in the most recent letter, respondent's counsel states that he has verified there are criminal charges pending against respondent in Germany relating to her removal of the children and that she would face the possibility of being jailed if she returned there.  Petitioner's proposal, therefore, does not appear to be feasible.  Accordingly, the Court's grave-risk analysis focuses on returning the children to live with the petitioner.

5.   Any issues regarding custody of the children must be resolved in a court of proper jurisdiction.  The Court expresses no opinion on whether jurisdiction lies in the German Court, where petitioner states that he has filed for custody, or the Benton County, Arkansas Circuit Court, where the respondent has filed for custody.